Paul Hupp
965 Hidden Oaks Drive
Beaumont, CA 92223
*In Propria Persona*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

Paul Hupp,                                              )
                                                       )
            Plaintiff,                                 )    Case No.: EDCV-14-00576 VAP (SP)
                                                       )
      v.                                               )
                                                       )
County of San Diego;                                   )
Brenda M. Cash;                                        )
Theodore C. Rigsby, A/K/A "Ted" Rigsby;                )    **PLAINTIFF PAUL HUPP'S FIRST**
Michael Walter Flesock;                                )    **AMENDED COMPLAINT AND DEMAND**
Karen G. Johnwell;                                     )    **FOR JURY TRIAL**
Joseph M. Powers;                                      )
Jonathan N. Quatman;                                   )
Nick J. Gamble;                                        )
Michael Krinock III;                                   )
Robert Schillinger;                                    )
Roes 1-25;                                             )
Individually, Jointly, Jointly and Severally,          )
                                                       )
            Defendants.                                )
                                                       )

## COMPLAINT

Plaintiff Paul Hupp, in *Propria Persona*, files his First Amended Complaint pursuant to

Fed .R. Civ. P. 15(a) against Defendants County of San Diego; Brenda M. Cash; Theodore C.

Rigsby, A/K/A "Ted" Rigsby; Michael Walter Flesock; Karen G. Johnwell; Joseph M. Powers;

Jonathan N. Quatman; Nick J. Gamble, Michael Krinock III, Robert Schillinger and Roes 1-25 in

this Complaint as follows;

## PARTIES, VENUE AND JURISDICTION

1.  Paul Hupp ("Plaintiff") resides, and is domiciled within the State of California.

2. County of San Diego ("COUNTY") is one of the 58 county subdivisions of the State of California and is defined and authorized under the California Constitution and California law, specifically California Government Code § 23004; and the Charter of the County of San Diego, California.

3. Brenda M. Cash ("CASH") was the Warden at California Institution for Men at Chino, CA ("CIM-CHINO"), a penal institution under the direction of the California Department of Corrections and Rehabilitation ("CDCR"), at all relevant times for the actions in this complaint. CASH is being sued individually.

4. Theodore C. Rigsby, A/K/A "Ted" Rigsby ("RIGSBY") was a "Correctional Counselor III"[1] at CIM-CHINO at all relevant times for the actions in this complaint. RIGSBY is being sued individually.

5. Michael Walter Flesock ("FLESOCK") was a "Staff Clinical Psychologist" at CIM-CHINO at all relevant times for the actions in this complaint. FLESOCK is being sued individually.

6. "Karen G. Johnwell" ("JOHNWELL") was a "Correctional Counselor I" at CIM-CHINO at all relevant times for the actions in this complaint. JOHNWELL is being sued individually.

7. Joseph Powers ("POWERS") was a "Correctional Officer"[2] holding the position of "Sergeant" at CIM-CHINO at all relevant times for the actions in this complaint. POWERS is being sued individually.

---

[1] On information and belief, "Correctional Counselor" jobs at CDCR, including "Correctional Counselor I, II and III", are merely "Correctional Officers" who have been promoted and there is no requirement that they are required to have a graduate degree, a four (4) college degree, a two (2) year college degree or college education of any kind whatsoever to be employed as a Correctional Counselor at CDCR.

[2] "Correctional Officers" ("CO") are state prison guards. The only educational requirement to become a CO is a GED.

8. Jonathan N. Quatman ("QUATMAN") was a "Correctional Officer" at CIM-CHINO at all relevant times for the actions in this complaint. QUATMAN is being sued individually.

9. Nick J. Gamble ("GAMBLE") was a "Correctional Officer" at CIM-CHINO at all relevant times for the actions in this complaint. GAMBLE is being sued individually.

10. Michael Krinock III ("KRINOCK") was a "Correctional Officer" at CIM-CHINO at all relevant times for the actions in this complaint. KRINOCK is being sued individually.

11. Robert Schillinger ("SCHILLINGER") was a deputy sheriff with the San Diego County Sheriff's Department at all relevant times for the actions in this complaint. SCHILLINGER is being sued individually and in his official capacity as deputy sheriff for COUNTY.

12. Roes 1-25 are unknown at this time but will be named and added to the FAC as their identities are ascertained and become known.

13. CASH, RIGSBY, FLESOCK, JOHNWELL, POWERS, QUATMAN, GAMBLE and KRINOCK defendants collectively "CIM-CHINO DEFENDANTS".

14. COUNTY, CASH, RIGSBY, FLESOCK, JOHNWELL, POWERS, QUATMAN, GAMBLE, KRINOCK, SCHILLINGER and ROE defendants collectively "DEFENDANTS".

15. CIM-CHINO is located in San Bernardino County.

16. San Bernardino County is a body of state government located within the State of California.

17. San Bernardino County is a body of state government located within the Central District of California for jurisdictional purposes.

18. All DEFENDANTS are sued individually, jointly and jointly and severally.

19. This action arises under the United States Constitution, particularly under the provisions of the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution and under the laws of the United States, particularly the Civil Rights Act, Title 42 of the United States Code, Sections 1983 and 1988.

20. This court has original jurisdiction of this action under the provisions of Title 28 of the United States Code, Section 1343-Civil rights and elective franchise.

21. This court has original jurisdiction of this action under the provisions of Title 28 of the United States Code, Section 1331-Federal question.

22. This court has original jurisdiction of this action under the provisions of Title 28 of the United States Code, Sections 2201 and 2202-Declaratory and injunctive relief.

23. This court has original jurisdiction of this action under the Federal Rules of Civil Procedure, Rule 23[3]. Plaintiff seeks class action certification for Cause of Actions ("COA") I and II.

24. This court has supplemental jurisdiction of state law claims that arise out of the nucleus of operative facts, case, or controversy common to the Plaintiff's federal claims under the provisions of Title 28 of the United States Code, Section 1367(a)-Supplemental jurisdiction.

---

[3] Fed. R. Civ. P. Rule 23 allows class action certification if several factors are met;(1) the class is so numerous that joinder of all members is impracticable, <u>numerosity;</u> (2) there are questions of law or fact common to the class, <u>commonality;</u> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Plaintiff is contemporaneously filing a motion for class action certification with this FAC. Plaintiff represents that the Rule 23 factors are met in Cause of Actions I and II of this Complaint. Plaintiff has the knowledge, background, skill and ability to fully, fairly and adequately represent the proposed classes in this Complaint should the Court certify it as a class action, but is an **unlicensed** attorney. If this Court refuses to allow Plaintiff to represent the classes in Cause of Actions I and II Plaintiff requests that this Court appoint counsel to represent the classes.

25.  This court has venue over this case under the provisions of Title 28 of the United States Code, Section 1391(b) and (c).

## FACTUAL ALLEGATIONS

26. On February 19, 2013, Plaintiff was convicted of non-violent felony offenses in San Diego Superior Court; case No.: SDC238651.

27. The felony offenses are under appeal[4] and the underlying actions have been the subject of a lengthy federal lawsuit[5] against the prosecutor for violating Plaintiff's constitutionally protected rights.

28. Plaintiff was remanded into COUNTY custody at or around 2:00 PM that day, February 19, 2013.

29. As Plaintiff was remanded to custody after a court trial he was still wearing a suit, tie, dress shirt, t-shirt, belt, underwear, dress socks and dress shoes.

30. Plaintiff took off his suit jacket, tie and belt and gave them to his attorney, but wore his suit pants, dress shoes, dress shirt, dress socks, underwear and t-shirt when taken into custody.

31. Plaintiff's suit was his best suit, manufactured by "Hickey-Freeman", in excellent condition with a retail cost of approximately $2,500 plus tax of $238. [$2,738].

32. Plaintiff's Hickey-Freeman suit had been specially tailored, including "re-cutting" the pants due to his unique body type at an additional cost of $120. [$120/$2,858].

---

[4] *See* People v. Hupp, Case No.: D064053, Fourth District Court of Appeal, Division I, pending.
[5] *See* Hupp v San Diego County et al, United States District Court, Southern District of California, Case No.: 12-cv-492 GPC (RBB), pending.

33. Plaintiff's dress shirt, in new condition, was his best shirt, manufactured and sold by "Nordstrom"; a "John W. Nordstrom Signature" shirt made from Egyptian cotton with a retail cost of approximately $135 plus tax of $13. [$148/$3,006].

34. Plaintiff's dress shoes were his best shoes, manufactured by "Johnston and Murphy", the "Georgetown II Cap-Toe". The Johnston and Murphy shoes were in **new** condition with almost **no** wear whatsoever, with a retail cost of approximately $375 plus tax of $36. [$411/$3,417].

35. Plaintiff's Johnston and Murphy dress shoes had heel and toe taps added on the leather soles at an additional cost of $24. [$24/$3,441].

36. Plaintiff also had underwear, a t-shirt under his dress shirt and dress socks for an additional cost of approximately $25 plus tax of $2. [$27/$3,468].

37. Plaintiff also had in his possession a commemorative wallet recognizing his graduation from graduate school. The wallet was irreplaceable. The commemorative wallet was unique, limited to just the graduating members of Plaintiff's graduate school class and 100% irreplaceable. Plaintiff's wallet has a sentimental value to him exceeding $5,000.[$5,000/$8,468].

38. Plaintiff's wallet contained several credit cards, three (3) gift cards with various amounts of credit on them that were not specifically known but believed to contain approximately $50 each (Amazon, Barnes and Noble and Nordstrom's), for a total of $150. [$150/$8,618].

39. The cost to replace Plaintiff's various credit cards, business contact cards, healthcare membership card, library card, was mainly attributed to the time involved (20+ hours) in securing the various items at an approximate value of $400. [$400/$9,018].

40. Plaintiff's CA state driver's license took four (4) hours of Plaintiff's time to replace at an approximate value of $80. [$80/$9,098].

41. Plaintiff's CA state driver's license actual replacement cost was an additional $26. [$26/$9,124].

42. These items were documented and itemized (with a replacement value exceeding $9,124 as evidenced by the listed work-up *supra*) on the San Diego County Sheriff's property intake forms on intake into custody on <u>February 19, 2013</u>.

43. Plaintiff was ordered by the court to undergo a "90-Day Diagnostic Evaluation"[6] at the CDCR intake facility for San Diego County, which is CIM-CHINO.

44. The 90-Day Diagnostic Evaluation ("90-Day Diagnostic Evaluation") is codified under California Penal Code §1203.03[7].

45. There are no objective criteria on the face of the 90-Day Diagnostic Evaluation statute on how to assign or apply it, giving it a facially **arbitrary and capricious** application to whomever receives it.

46. There is no objective criteria on the face of the 90-Day Diagnostic Evaluation statute in who administers it at CDCR, how it is administered, the method of

---

[6] The term "90-Day Diagnostic Evaluation" is not mentioned in the actual Penal Code section, California Penal Code §1203.03, but it seems to be the term commonly referred to for the program and Plaintiff will use that term in this action.

[7] California Penal Code §1203.03 states in part; "1203.03. (a) In any case in which a defendant is convicted of an offense punishable by imprisonment in the state prison, the court, if it concludes that a just disposition of the case requires such diagnosis and treatment services as can be provided at a diagnostic facility of the Department of Corrections, may order that defendant be placed temporarily in such facility for a period **not to exceed 90 days**, with the further provision in such order that the Director of the Department of Corrections report to the court his **diagnosis and recommendations** concerning the defendant within the 90-Day period. (b) The Director of the Department of Corrections shall, within the 90 days, **cause defendant to be observed and examined** and shall forward to the court his diagnosis and recommendation concerning the disposition of defendant's case. Such diagnosis and recommendation shall be embodied in a written report and copies of the report shall be served only upon the defendant or his counsel, the probation officer, and the prosecuting attorney by the court receiving such report. After delivery of the copies of the report, the information contained therein shall not be disclosed to anyone else without the consent of the defendant". **Bold and underline added**. <u>No where</u> in the statute does it state that the main, or even one, purpose is to **<u>"negatively"</u>** impact the subject.

administration, the actual testing and evaluation, or if such factors are valid and reliable in making any kind of diagnostic measurement or evaluation whatsoever, giving it a facially **arbitrary and capricious** application in whether the evaluation is valid, fair or legitimate in how it is applied and carried out.

47. Plaintiff was in San Diego County jail from <u>February 19, 2013</u> until <u>March 25, 2013</u>. On <u>March 25, 2013</u> Plaintiff was transferred from San Diego County jail to CIM-CHINO of the CDCR.

48. Plaintiff was in the custody of CIM-CHINO from <u>March 25, 2013</u> through <u>May 16, 2013</u>, a total of 52 days.

49. San Diego County jail transferred all of Plaintiff's physical belongings that were taken at intake on <u>February 19, 2013</u> to CIM-CHINO when Plaintiff was transferred the morning of <u>March 25, 2013.</u>

50. Plaintiff had a cash balance of $60.01 on his trust account at the San Diego County jail.

51. San Diego County jail did **NOT** transfer his trust account funds of $60.01.

52. Upon arrival at "Receiving and Release"[8] ("R&R") at CIM-CHINO the morning of <u>March 25, 2013,</u> defendants QUATMAN and GAMBLE gave Plaintiff a paper bag containing possession of some, but not all, of Plaintiff's physical belongings, including his suit pants, dress shoes, dress shirt, dress socks, underwear and t-shirt, the items he was wearing when taken into custody.

53. Missing from these possessions were Plaintiff's wallet and its contents.

54. Defendants POWERS, QUATMAN, GAMBLE, KRINOCK and several other CO'S were working at R&R and ordered Plaintiff to strip off his county jail clothes, and throw all of his physical belongings, including his suit pants, dress

---

[8] R&R at CIM-CHINO is where all incoming inmates are received and processed in, and all inmates being released are processed out.

shoes, dress shirt, dress socks, underwear and t-shirt, into a plastic bin so they could be "donated" to others.

55. Plaintiff refused and told defendants POWERS, QUATMAN, GAMBLE and KRINOCK that these were expensive dress clothes and CIM-CHINO needed to hold them for Plaintiff as Plaintiff was not a sentenced prisoner, but was only there for a brief 90-Day Diagnostic Evaluation.

56. At this point QUATMAN and GAMBLE grabbed Plaintiff's suit, dress shirt, t-shirt, belt, underwear, dress socks and dress shoes his suit pants, dress shoes, dress shirt, dress socks, underwear and t-shirt and threw them into the plastic "donation" bin, without Plaintiff's consent or approval.

57. There were approximately 25 inmates being processed in with Plaintiff and each and everyone were forced to throw their personal belongings into this plastic bin to be "donated"[9].

58. Defendants POWERS, QUATMAN, GAMBLE and KRINOCK then spent the next 2 hours processing Plaintiff through the CIM-CHINO intake process.

59. After approximately one (1) hour into the intake process GAMBLE called Plaintiff to the intake desk where he, GAMBLE, standing next to POWERS and KRINOCK, had prepared a form titled **"PROPERTY AND CASH RECEIPTS-ARRIVAL"**[10] ("PCR-A FORM").

60. The PCR-A FORM had Plaintiff's name and CDCR identification number, both had been machine printed. On the top half of the form were categories for various articles of personal property listed in three (3) columns, 1) QUANTITY, 2)

---

[9] On information and belief, all "donated" personal property of value is obtained by CIM-CHINO CO'S and employees through conversion.

[10] Attached to, made a part of and by this reference incorporated into this Complaint as "Exhibit #1" is a true and correct copy of the PCR-A FORM from CIM-CHINO which Plaintiff was forced to sign under threat of being pepper sprayed by defendant KRINOCK.

ARTICLES, 3) DISP. (Plaintiff assumes DISP. is abbreviated for "Disposition").
The categories included, but not limited to, clothing, legal papers, **DRIVERS
LICENSE, BILLFOLD**.

61. CIM-CHINO employees, presumably GAMBLE, had filled out by hand a **partial**
list of Plaintiff's personal property. The items started with a quantity, followed by
the article/item, followed by a disposition code of "K" (KEPT IN POSSESSION)
or "D" (DONATED).

62. Plaintiff's PCR-A FORM showed; 1/PANTS/D; 1/SHIRT/D; 1/SHOES/D;
10/LEGAL PAPERS/K; 10/LETTERS/K, indicating that Plaintiff had "donated"
his $2,500 Hickey-Freeman suit pants, his $135 Nordstrom dress shirt and his
$375 Johnston and Murphy dress shoes.

63. There was no listing or accounting for Plaintiff's t-shirt, underwear, dress socks,
wallet or wallet contents despite a specific category for **UNDERWEAR,
BILLFOLD** [WALLET] and **DRIVERS LICENSE**.

64. Below the inventory of articles and items was a section titled; **"DESCRIPTION
OF ITEMS ALLEGED BY INMATE TO HAVE A VALUE OVER $30"**.
Under this section was a handwritten notation that was **not** written by Plaintiff,
which said **"no personal property"**.

65. The PCR-A FORM had all been filled out by hand by CIM-CHINO employees,
presumably GAMBLE. GAMBLE ordered Plaintiff to sign the form.

66. Plaintiff read the PCR-A FORM, and at the bottom directly above the signature
block written in capital letters were the words **"CLAIM AND RELEASE"**.
Directly below the **CLAIM AND RELEASE**, but above the signature block
where Plaintiff signed, was the following language;

"I relinquish all claim to the articles listed above as "Donated", and hereby
acknowledge receipt of articles listed as "Kept in Possession". The above

is a correct inventory of my personal property in my possession at the time of admission".

67. Plaintiff informed GAMBLE that his clothes were not to be donated and he would **not** sign the PCR-A FORM as it was filled out.

68. GAMBLE told Plaintiff to sign the PCR-A FORM because CIM-CHINO could not hold the property for Plaintiff, but Plaintiff could "mail" the clothing home if he had money on account at CIM-CHINO.

69. Plaintiff informed GAMBLE that he had money on his trust account from San Diego County jail and to use that money to mail the items home. GAMBLE informed Plaintiff that money was not at CIM-CHINO and would take several weeks, if not several months to get to CIM-CHINO.

70. Plaintiff told GAMBLE to use the credit card in his wallet to pay for the mailing charges. GAMBLE refused, claiming CIM-CHINO would not allow that.

71. GAMBLE then went into a wild and rambling tirade about how Plaintiff's trust money would be "seized" for "restitution" even if it were at CIM-CHINO.

72. Plaintiff again told GAMBLE he would not "donate" his expensive dress clothes.

73. GAMBLE became rude, violent and threatening with his voice, gestures and attitude and told Plaintiff he **had** to sign the PCR-A FORM. Plaintiff again told GAMBLE he would **not** donate his expensive clothes nor sign the PCR-A FORM.

74. KRINOCK then pulled out a large, industrial can of "pepper spray", a potentially deadly weapon, and pointed it directly at Plaintiff's face from a distance of 6-8 inches and stated; **"You're going to sign that fucking form right now you little mother fucker or your ass is going to get pepper sprayed and go straight into the "hole" for the next month"**.

75. KRINOCK'S statement was made in a rude, violent, threatening manner and tone, and there was no doubt in Plaintiff's mind that KRINOCK would do what he said if Plaintiff continued to refuse to sign the PCR-A FORM.

76. Plaintiff did sign the PCR-A FORM at that point.

77. Plaintiff was forced to sign PCR-A FORM or risk being assaulted with a deadly weapon from KRINOCK, but Plaintiff also struck out the words **"CLAIM AND RELEASE"** and the word **"Donated"** in the paragraph below it, establishing as fact that Plaintiff did not voluntarily "Release" or "Donate", or in any other way abandon his personal property.

78. KRINOCK and GAMBLE did not see or realize Plaintiff's actions in striking a portion of the PCR-A FORM, rendering it invalid.

79. GAMBLE then signed the PCR-A FORM and gave Plaintiff a yellow copy (original white copy was supposed to be the inmates copy). GAMBLE'S signature was illegible and Plaintiff then printed GAMBLE'S below where GAMBLE had signed.

80. POWERS was standing next to KRINOCK and was a direct witness to the violent, threatening and illegal conduct when KRINOCK threatened Plaintiff with a deadly weapon, and did nothing to stop the violent, threatening and illegal conduct of KRINOCK, nor intervene in any other way whatsoever.

81. GAMBLE likewise was standing next to KRINOCK and was a direct witness and did nothing to stop the violent, threatening and illegal conduct of KRINOCK, nor intervene in any other way whatsoever.

82. POWERS was a sergeant and supervisor at CIM-CHINO, and as such had a lawful duty to prevent and stop other CO'S and CIM-CHINO personnel from

engaging in violent, threatening and illegal conduct, such as the violent, threatening and illegal conduct KRINOCK perpetrated against Plaintiff.

83. GAMBLE had a lawful duty as a CO to prevent and stop other CO'S and CIM-CHINO personnel from engaging in violent, threatening and illegal conduct, such as the violent, threatening and illegal conduct KRINOCK perpetrated against Plaintiff.

84. At this point Plaintiff looked around the R&R to see if the actions of KRINOCK POWERS and GAMBLE had been caught on video camera. There were no video cameras[11] in R&R whatsoever, and Plaintiff did not observe a single video camera anywhere in the CIM-CHINO area he was located.

85. Approximately 45 minutes after KRINOCK violent, threatening and illegal conduct against Plaintiff, Plaintiff saw POWERS going through the sealed plastic bags that held the arriving inmates wallets. Plaintiff immediately identified his wallet because of its color, size and unique embossing of his graduate school.

86. Plaintiff yelled to POWERS that he was **not** to throw away or "donate" Plaintiff's wallet and its contents.

87. POWERS did not respond. Plaintiff was not aware of what POWERS did with his wallet but assumed it was being stored as it contained his driver's license, gift cards with balances remaining on them, credit cards, library card, healthcare membership card and numerous other valuable and personal property items.

88. That was the last time Plaintiff ever saw his wallet and the contents within it.

---

[11] Plaintiff, on information and belief, believes the lack of video cameras in R&R and elsewhere at CIM-CHINO is intentional, as Plaintiff saw the CO'S at R&R physically assault and batter an incoming inmate for failure to acknowledge them and talking while they were talking, this included CO'S POWERS, KRINOCK, QUATMAN and GAMBLE. Without video evidence it would be difficult, if not impossible, to prove CIM-CHINO CO and employee misconduct because it would be an issue of credibility between the inmate and CO or other CIM-CHINO employee. It should be noted video cameras are so inexpensive today that you can have a home system installed with six (6) or more high resolution cameras for less than $500. Virtually every county jail system within the State of California, which total in the hundreds, have multiple video cameras in every high traffic area, which R&R is.

89. On <u>April 16, 2013</u> and again on <u>May 27, 2013</u>, Plaintiff's family mailed letters to various state officials inquiring about Plaintiff's wallet and other personal property. On <u>June 13, 2013</u>, CIM-CHINO responded[12]. The CIM-CHINO letter clearly establishes that CIM-CHINO has a **policy**[13] of throwing away, "donating" or stealing all personal property of incoming inmates without regard to due process rights guaranteed under the Unites States Constitution.

90. After intake processing Plaintiff was assigned to a cell in "Cypress Hall". Plaintiff had no cell mate for the first 5 days, until <u>March 30, 2013</u>. On <u>March 30, 2013</u> Plaintiff was moved to another cell in Cypress Hall and had a cellmate.

91. The light in the new cell did not function.

92. Plaintiff made at least 15 "inmate requests" to have the light fixed. Plaintiff received no responses.

93. Plaintiff filed multiple CDCR "602 Appeal Grievance" forms to have the light fixed. Plaintiff received no responses.

94. The light remained broken for the entire 47 days Plaintiff was in that cell.

95. It was important to have a working light because Plaintiff was in CDCR "Reception"[14].

---

[12] Attached to, made a part of and by this reference incorporated into this Complaint as "Exhibit #2" is a true and correct copy of the <u>June 13, 2013</u> letter from CIM-CHINO "Associate Warden" Dennis R. King.

[13] The <u>June 13, 2013</u> letter from CIM-CHINO "Associate Warden" Dennis R. King states, verbatim; "The personal clothing you claim Mr. Hupp had in his possession are non-allowable items at CIM and must either be mailed home at his expense or donated." CIM-CHINO gives no other options as a matter of policy, except these two (2) listed by King; 1) "donate" the personal property, or risk retaliation with a deadly weapon by CIM-CHINO employees such as CO KRINOCK, or; 2) mail the items home at inmate's expense. If the inmate's money from the local county jail was not sent with their other personal property then the personal property is thrown away, "donated" or stolen by CO'S without regard to due process property rights. This is simply an <u>unlawful</u> "taking" by government action.

[14] "Reception" is the initial time period an inmate spends upon arrival at CDCR where they are "classified" based on numerous CDCR factors, such as prior criminal history, current criminal offense/s, prior prison terms, current prison term length and a number of other factors. Once an inmate is classified they are then sent to another prison (CIM-CHINO has the largest lowest level security "Level-I" prison yard in CA and some inmates stay at CIM-CHINO) to serve out their term. In the Reception period inmates are locked down 23 ½ to 24 hours per day, with only a 10 minute break for breakfast and a 10 minute break for dinner, the rest of the time is spent in the cell. There were a 10 of days of 100% "lock-down" where Plaintiff never left the cell at all and food was delivered in. Inmates are

96. On <u>March 27, 2013</u>, Plaintiff made an inmate request to have access to the law library to conduct legal research and draft legal papers for the litigation in his criminal case, as well as multiple other civil cases. Plaintiff received no response.

97. Plaintiff filled out at least 15 more inmate requests to get access to the CIM-CHINO law library. Plaintiff received no responses.

98. Plaintiff was unable to contact the courts where his cases were pending nor was he was able to contact his criminal attorney except by mail, and that was useless.

99. Plaintiff defaulted on numerous motions in numerous civil cases due to the lack of access to the law library at CIM-CHINO, and as a direct result a lack of access to the courts.

100.     The defaulted motions resulted in Plaintiff having two civil cases dismissed, and one criminal appeal being dismissed for failure to reply to the deadlines and filing of opposition papers, and judgments exceeding $80,000 levied against Plaintiff.

101.     On <u>April 10, 2013</u> Plaintiff had the first of his two (2) interviews that would make up and comprise his entire "90-Day Diagnostic Evaluation".

102.     The <u>April 10, 2013</u> "90-Day Diagnostic Evaluation" was with defendant JOHNWELL, a "Correctional Counselor I", who refused to indentify herself when Plaintiff asked what her name was. JOHNWELL'S reply was "Who said you could speak". The interview lasted less than 45 minutes.

---

supposed to be given two (2) hours of outside "yard" time every four (4) days, but during Plaintiff's 52 day term he was only given five (5) actual yard visits totaling less than 10 hours. There are no books, no TV, no magazines, no telephones. It is complete, 100% "dead time" with no activities whatsoever. One of the stated purposes of the 90-Day Diagnostic Evaluation is to have the inmate "observed and examined" in order to see if they should be sentenced to county jail time and probation or state prison time and parole. The "observed and examined" requirement of the statute is virtually impossible when an inmate is in Reception lock-down of 23.5 to 24 hour per day the entire time period.

103.     JOHNWELL had performed no prior review or research of Plaintiff, his case, his circumstances or in any other way prepared herself for the short interview.

104.     JOHNWELL was rude, hostile, demeaning, arrogant and had an overall demeanor of distinct unpleasantness to her.

105.     JOHNWELL, who is black, started to address Plaintiff as "cracker"[15], "whitey" and "white boy". Plaintiff assumed this was some sort of test by JOHNWELL to see if Plaintiff would react to the racial slurs, which Plaintiff did not.

106.     JOHNWELL started to read the San Diego County probation report and asked verbatim questions that were already stated in that report.

107.     When JOHNWELL asked Plaintiff why he engaged in the conduct that resulted in his conviction[16] Plaintiff told her he was not the one who was responsible and that was why he pled not guilty and went to trial. This reply enraged JOHNWELL, who then stated to Plaintiff; "…you better start saying the things I [JOHNWELL] want to hear or I am going to send you back to your cell right now and tell the judge you would not cooperate with the program and recommend a prison term."

108.     By JOHNWELL claiming she was going to tell the judge that Plaintiff was "not cooperating" because of Plaintiff giving an honest answer, even if it was not the answer JOHNWELL "wanted to hear", JOHNWELL established she was not

---

[15] The term "cracker" is a racial slur aimed at Caucasians.
[16] Plaintiff, following the advice of his attorney, told JOHNWELL his attorney advised him to not comment on the current charges as it could affect his appeal. This was the same advice given with regard to the San Diego Probation Officer who interviewed Plaintiff March 16, 2013. JOHNWELL became enraged at this answer and told Plaintiff the interview would be terminated and he would be recommended for a prison term if he did not respond to JOHNWELL'S questions about the conviction. The true purpose of the 90-Day Diagnostic Evaluation is to try to force the subjects, under threat, to respond to questions about their conviction with incriminating statements, thereby violating constitutionally protected rights under the Fourth, Fifth and Sixth Amendments.

Paul Hupp
Case No.: EDCV-14-00576 xxx (SP)

fit nor capable of making any recommendation to support a valid and reliable 90-Day Diagnostic Evaluation.

109.     JOHNWELL once again became enraged, even more enraged than she was prior, when she asked Plaintiff what was the highest year of high school he "completed" and Plaintiff replied he completed all four (4) years of high school but did not graduate due to failing two courses his final semester, but he did "complete" and finish out the four (4) years. This infuriated and enraged JOHNWELL, who claimed that because Plaintiff did not "graduate" he did not "complete" 12th grade, and that 11th grade was the highest year of high school he "completed". It is unclear why something so inconsequential and minute would cause such a hostile and violent outburst from JOHNWELL. Plaintiff again assumed it was some sort of test to see how Plaintiff would react. Plaintiff refused to argue with JOHNWELL over inconsequential facts and just remained silent during this tirade and the rest of JOHNWELL'S violent and racist outbursts.

110.     JOHNWELL continued to read the San Diego County probation report, and continued to ask the exact same questions the San Diego County probation officer asked Plaintiff on March 16, 2013. The questions were mainly background, and were already fully and fairly responded to in the San Diego County probation report on March 16, 2013.

111.     JOHNWELL continued to use racial slurs throughout the entire 45 minute interview, and continued to act in a hostile and angry manner.

112.     JOHNWELL wrote a two and a half (2.5) page report that same day which she titled "INSTITUTIONAL STAFF RECOMMENDATION SUMMARY PC 1203.03 REPORT", of which only the last half two (2) paragraphs had

JOHNWELL'S own reasons for her recommendation of a prison term. The report

is rife with grammar errors, misstated facts, misstated law and a completely

devoid of any "Diagnostic Evaluation" whatsoever.

113.     JOHNWELL in the final page of the report made numerous conclusory

statements that were not supported in the report, or any other record whatsoever.

114.     As just one (1) an example of misstated facts and law JOHNWELL stated

that there were three (3) restraining orders obtained against Plaintiff -that is

factually and legally wrong and not supported in any manner whatsoever. There

was only one (1) restraining order obtained, not three (3), and that single order

was granted in Plaintiff's absence by default due to the failure of the issuing court

to allow Plaintiff to appear at the hearing by telephone.

115.     In another patently unsupported statement JOHNWELL said Plaintiff

"…makes excuses and rationalizes his behavior." But JOHNWELL fails to cite to

any record or statement supporting her wild and conclusory statement.

116.     Virtually every "fact" JOHNWELL used in her own report was lifted or

copied verbatim off the San Diego County Probation Officers report, which was a

report that is clearly done in a biased and slanted manner as the Probation Office

is part of the prosecution team, and that fact is proven by the probation officer

sitting and conferring with the prosecution at their table during sentencing. The

probation officers report was rife with factual and legal errors, and that was just

copied almost word for word by JOHNWELL, with the exception that

JOHNWELL made so many grammar errors in her report that Plaintiff initially

lost track of the amount and had to go back and mark them with a pen.

117.     As one last example of false factual and legal statements in

JOHNWELL'S report, JOHNWELL claimed Plaintiff had a teaching credential

denied by the state. That is 100% false. The state tried to deny it, but their denial was overturned by the Superior Court and the state did in fact grant that teaching credential.

118.     Outside of the 45 minute interview JOHNWELL never "observed" or "examined" Plaintiff in any manner whatsoever.

119.     On information and belief, JOHNWELL has neither college degreed training nor certified formal training that would allow her to engage in, perform, render or make any type of "INSTITUTIONAL STAFF RECOMMENDATION SUMMARY PC 1203.03 REPORT" whatsoever.

120.     JOHNWELL'S 45 minute interview could in no way support a valid or reliable "Diagnostic Evaluation" of Plaintiff, and certainly not a purported 90-Day Diagnostic Evaluation that sought to "observe and examine" Plaintiff. Plaintiff never saw JOHNWELL except for the 45 unpleasant minutes he spent with her during his interview.

121.     JOHNWELL'S repeated use of racial slurs would render invalid any "INSTITUTIONAL STAFF RECOMMENDATION SUMMARY PC 1203.03 REPORT" even if JOHNWELL *did* have the training and education required to competently perform a Diagnostic Evaluation, as her repeated racial slurs would affect the subject's state of mind.

122.     Because Plaintiff knew JOHNWELL would most likely deny making such racial slurs, Plaintiff documented and memorialized them and the rest of JOHNWELL'S misconduct in letters written that afternoon to his attorney and mother.

123.    JOHNWELL, based on her 45 minute interview with Plaintiff, which was based on the San Diego County probation report, refused to give Plaintiff a positive recommendation and instead recommended a prison term.

124.    JOHNWELL'S April 10, 2013 90-Day Diagnostic Evaluation recommendation of a prison term at CDCR is not supported by the facts or the law.

125.    A 45 minute interview which JOHNWELL was completely unprepared for is simply not anywhere near what is needed for a valid and legitimate 90-Day Diagnostic Evaluation.

126.    A "Correctional Counselor I" such as JOHNWELL, who may not possess any formal education beyond a GED, does not even remotely have the education, skill or experience to make any recommendation whatsoever relating to an "INSTITUTIONAL STAFF RECOMMENDATION SUMMARY PC 1203.03 REPORT" much less a 90-Day Diagnostic Evaluation.

127.    JOHNWELL'S repeated grammar errors and butchering of the English language in her short, limited two and a half page (2.5) report further buttresses she is unqualified in virtually every respect to be engaging in such measurements, testing and evaluations.

128.    At the end of JOHNWELL'S 45 minute interview JOHNWELL stated to Plaintiff she was going to recommend county probation and not a prison term.

129.    JOHNWELL instead recommended a prison term, making her a bald faced liar in addition to a racist and incompetent report writer.

130.    After the JOHNWELL interview on April 10, 2013 Plaintiff was locked down in his cell, which had no working light, for the next 28 days.

131.    On or about <u>May 7, 2013</u> Plaintiff had the first of two (2) interviews with FLESOCK. The first interview lasted only 20 minutes and went over the same background information that by this point had already been reviewed twice within the prior 50 days, once with the San Diego County probation officer in <u>March</u> and a second time with JOHNWELL in <u>April</u>.

132.    The first interview was supposed to be an hour but FLESOCK was called away for a training class that had priority.

133.    A second interview with FLESOCK took place on or about <u>May 14, 2013</u> and lasted approximately 45 minutes and reviewed the background of Plaintiff and the criminal conviction of <u>February 19, 2013</u>.

134.    On <u>May 29, 2013,</u> more than two (2) weeks after the *last* interview, FLESOCK wrote a three and a half (3.5) page report titled "PSYCHOLOGICAL EVALUATION REPORT".

135.    As with JOHNWELL'S report, FLESOCK'S report contained several verifiably false factual and legal errors, but unlike JOHNWELL, FLESOCK did take a minimal, yet still severely insufficient amount of time to review the pertinent background facts personally instead of lifting them off of the San Diego County probation officers report verbatim even though it did not seem to help him with his accuracy in writing his report.

136.    As with JOHNWELL, FLESOCK became upset and visibly agitated when Plaintiff denied the conduct of his conviction. FLESOCK, like JOHNWELL, said he too would inform the trial judge that Plaintiff would not cooperate unless he admitted to the conduct upon which he was convicted. Plaintiff again refused.

137.    The second (2) page of FLESOCK'S report references the non-working light in Plaintiff's cell, establishing corroboration of the living conditions Plaintiff was subjected to and repeatedly complained about to CIM-CHINO.

138.    Like JOHNWELL, FLESOCK also made numerous conclusory statements that were unsupported by the record in any manner whatsoever. One such statement was; "Narcissistic personality traits were persistently noted during the evaluation process." Yet FLESOCK does not support the statement with any data to substantiate it whatsoever.

139.    Plaintiff took the Minnesota Multiphasic Personality Inventory-II ("MMPI") test at FLESOCK'S request. The MMPI is a 567 question test that was formulated in 1943 and updated in 1989. It is considered by many, but not all, professionals in psychology and related fields to be valid and reliable.

140.    Plaintiff has taken the MMPI on at least 15 other occasions, and possibly many more times, as part of employment interview testing. Plaintiff always passed the test and continued on in the interviewing process with the employers that administered the test. Plaintiff was never eliminated from a potential job based on the MMPI. This would be an indication that Plaintiff had no anti-social or other personality disorders that would interfere with private sector job performance and abilities of Plaintiff to be successful with the public in the given job.

141.    Plaintiff answered all the MMPI questions candidly and honestly.

142.    FLESOCK claimed in his report that Plaintiff's "profile was invalid, with a very strong tendency to create an overly favorable and virtuous presentation by concealing and minimizing symptoms, problems or difficulties...presenting what

is known as a "fake good" profile"[17]. FLESOCK then went on to speculate that Plaintiff's scale on the "Over Controlled [sic] Hostility scale" ("O-H scale") was "significantly elevated". FLESOCK in no way qualifies or quantifies what his measurement of "significantly elevated" actually is. As to what this measurement entails, only FLESOCK knows for sure what his "significantly elevated" measurement means.

143.     FLESOCK never discloses in his report the fact that the O-H scale is not a "clinical scale", nor a "validity scale" but is one of dozens and dozens of "supplemental scales" used in the MMPI.

144.     FLESOCK cannot choose what he wants to include in his report based on an "invalid" MMPI then subsequently leave out what he finds unfavorable.

145.     One of the multiple factual and legal errors FLESOCK made was that Plaintiff had a prior conviction for "PC272". Plaintiff has never had a valid conviction for any criminal act whatsoever, outside of the current charges which are not final and are on appeal. This includes a prior conviction for "PC272".

146.     FLESOCK claims Plaintiff "...suffers from an acute or chronic mental illness...", yet provides no support for the conclusory statement, or how he came

---

17 As one prominent researcher, Robert M. Gordon, Ph.D., states; "MMPI-2 Faking to Look Good" Originally, the MMPI was used to diagnose psychiatric inpatients. Today, the MMPI-2 is largely used on non-patient populations who are motivated to under report psychopathology. They wish to get or keep a position, or have use of a lethal weapon, have a favorable custody decision, adopt a child, have a medical procedure, etc. **It would be understandable for them to "fake to look good."** .... Although the MMPI-2 can provide a hypothesis about under-reporting psychopathology, only good diagnostic interviewing, document review, history, projectives, the DSM Defensive Functioning Scale and the PDM's assessment of Mental Functioning (M Axis) can determine the meaning of the validity scales." Bold and underline added. It is very clear that although certain traits can be extrapolated from the MMPI, to make the MMPI valid and reliable it takes a far more intensive review than miniscule two (2) interviews, lasting less than 65 minutes total, that CDCR performs for the 90-Day Diagnostic Evaluation. The CDCR testing and measuring for the 90-Day Diagnostic Evaluation as it is currently conducted is not valid, it is not reliable and it is in fact a sham. The one (1) and only (CDCR admitted) apparent purpose being to "negatively" impact the subject of it, with a possible second purpose being to force subjects into false admissions of their pending convictions.

to such a conclusion based on just two (2) interviews separated by approximately seven (7) days, lasting a total of approximately 65 minutes.

147.  A telling statement of FLESOCK'S incompetence, or at the very least biased testing, was stated in his report when he considered one (1) single statement made by Plaintiff (which Plaintiff hereby admits to making) to sum up "...substantial evidence for incarceration."[18] The statement made by Plaintiff was; "What do you want me to tell you to recommend probation?" It was a way for Plaintiff to make sure he was able to communicate to FLESOCK all relevant, material, pertinent, and germane information upon which FLESOCK could base, use or may need to make a positive recommendation for felony probation. No reasonable person would conclude that question posed by Plaintiff was anything other than an honest attempt to give FLESOCK all the information he needed for a positive recommendation.

148.  But by far the most egregious, erroneous and false statement FLESOCK uses in his report, which is both factually and legally incorrect, is the verifiably false statement that Mr. Hupp did not properly disclose;

> "...his criminal conviction on his teaching credential application in the first place. Anyone who holds a professional license in California must disclose criminal convictions for each license renewal period under penalty of perjury."

149.  As with JOHNWELL'S misstatement of the facts *and* the law as it related to this specific issue, which both JOHNWELL and FLESOCK lifted off of the San Diego County probation report without verifying its validity or reliability, FLESOCK too misstates the facts *and* the law. **First**, Plaintiff candidly and

---

[18] FLESOCK'S statement about "incarceration" is nonsensical in that Plaintiff was already incarcerated and would continue to be incarcerated, either in county jail or state prison, irrespective of FLESOCK'S recommendation, the only question was where. FLESOCK'S statements about "high risk" parole, its supervision and other traits, are subjects in which FLESOCK has absolutely no training on, no experience with, has no expertise with and obviously no direct knowledge of as his ignorant statement is so easily verifiable as false.

honestly filled out his teacher credentialing application; there was *no* perjury, there was *no* lie, which is established *fact*. **Second**, there was NO LAW or question on the teacher credentialing form Plaintiff filled out in 1986 that stated "criminal convictions" must be disclosed. As FLESOCK did not have a copy of that specific teacher credential application, nor did he bother to verify its contents, there is no way he could possibly know what was, or was not, on that specific application form. Yet FLESOCK submitted that 100% unsupported, factually and legally incorrect statement in his report and then submitted that report to a judge to support a recommendation of a state prison term. FLESOCK'S statement was 100%, verifiably false. **Third**, Plaintiff did nothing wrong when filling out his teacher credential application in 1986, but it was the Teacher Commission that was engaged in wrong doing. That is a verified and undisputed finding of fact by the Superior Court, who ordered the commission grant Plaintiff his credential. Which the commission did.

150.     During the interview process FLESOCK personally made the admission to Plaintiff that the 90-Day Diagnostic Evaluation's real and true purpose was to lock individuals up in solitary confinement for nearly 24 hours per day, seven (7) days per week for weeks and months on end, with no books, no magazines, no TV nor any other type of activity to pass the day, so they could "sit, stew and marinate" at CIM-CHINO.

151.     FLESOCK expressly memorialized this illegal and unlawful use of the 90-Day Diagnostic Evaluation in his report, on page #3, under **"DISCUSSION"**, where FLESOCK expressly states: **"He [Plaintiff] has been very negatively**

**impacted by his state prison stay in my opinion, one of the reasons for the**

**PC1203.03 [90-Day Diagnostic Evaluation] process."** Bold and underline

added.

152.     **NO WHERE under the 90-Day Diagnostic Evaluation statute is there**

**any statement even remotely suggesting that the 90-Day Diagnostic**

**Evaluation process is to be used to <u>negatively impact</u> the subject.**

153.     **That FLESOCK would make such a statement to Plaintiff in person,**

**and then memorialize it in a written communication, shows how far off the**

**tracks the 90-Day Diagnostic Evaluation process has deviated from being a**

**legitimate and valid purpose to assist a court, if there ever was a legitimate**

**purpose for it in the first place.**

154.     One last particularly glaring example of either outright lying, or sheer

ignorance of the law, was that a state prison term would result in Plaintiff

"...being placed on state parole likely as a high risk offender with a much longer

degree of supervision relative to county probation." County probation is in fact

far more intensive than state parole, which is mostly a hands off, stay out of

trouble for 12-18 months supervision and you're released from parole. County

probation requires weekly check ins, monthly meetings, numerous mandatory

classes and a far longer, five (5) years, probation period.

155.     FLESOCK'S entire report is inaccurate, misstates the facts, misstates the

law and is neither valid nor reliable based on those factors alone.

156.     On <u>May 29, 2013</u>, RIGSBY, made a third and final 90-Day Diagnostic

Evaluation report that was only one (1) page. RIGSBY never spoke to Plaintiff.

RIGSBY never interviewed Plaintiff. RIGSBY never had any interaction with Plaintiff in any manner whatsoever.

157.     RIGSBY followed the recommendations of both JOHNWELL and FLESOCK (recommending a prison term at CDCR) which in turn were essentially either the verbatim or parroted statements from the San Diego County probation report, with very little independent investigation by FLESOCK, and absolutely no independent investigation by JOHNWELL or RIGSBY.

158.     **On information and belief, all, or substantially all (95%+) of the 90-Day Diagnostic Evaluation subjects are recommended for state prison terms, rendering the 90-Day Diagnostic Evaluation nothing more than a tool for the prosecution and to keep CDCR supplied with inmates.**

159.     **CDCR'S pecuniary interest in the 90-Day Diagnostic Evaluation renders their evaluation biased, unreliable and 100% invalid.**

160.     On <u>May 16, 2013</u>, Plaintiff's 90-Day Diagnostic Evaluation ended and defendant SCHILLINGER, employee of Defendant COUNTY, arrived at CIM-CHINO to transport Plaintiff back to San Diego County jail.

161.     SCHILLINGER told Plaintiff to "travel light", which is a bizarre statement as there were only two (2) inmates being transported back to San Diego County jail aboard a full size bus. As Plaintiff was going through the release process at R&R of CIM-CHINO, SCHILLINGER brought a form to Plaintiff to sign that detailed his personal property. On the form it was noted that there was **NO** wallet. Plaintiff asked SCHILLINGER where his wallet was, assuming POWERS and CIM-CHINO had kept it safe and secure, as they surely could not

claim that Plaintiff would "donate" his commemorative and irreplaceable wallet, credit cards, drivers license, gift cards and numerous other items.

SCHILLINGER claimed he didn't know where the wallet was, and again asked Plaintiff to sign the form. Plaintiff refused. This was the first point Plaintiff discovered that POWERS, QUATMAN, GAMBLE, KRINOCK and other CO'S, had either stolen or thrown away Plaintiff's wallet and its contents.

162.    Plaintiff's personal property was in a single brown paper sack, which is typically used at grocery stores, and that sack was sitting outside the gated holding area in R&R where Plaintiff was secured. Inside of that sack were numerous items of Plaintiff's personal property, including but not limited to premium soap from the San Diego County jail commissary system, numerous newspaper articles that had been sent in to CIM-CHINO by mail, numerous letters and envelopes of various sizes sent in to CIM-CHINO by mail from family members and friends; and especially important were hundreds of pages of legal documents served on Plaintiff at CIM-CHINO.

163.    SCHILLINGER took Plaintiff's sack of personal property and went to an area where he could not be observed in any manner whatsoever and went though the entire sack of Plaintiff's personal property. SCHILLINGER threw in the trash numerous letters, newspaper articles, soap, and many other personal items. But most importantly SCHILLINGER threw out the majority of Plaintiff's legal documents. The legal documents had been placed in the large envelopes that the newspaper articles had arrived in and were comingled in with them.

SCHILLINGER just threw out these envelopes in mass without determining what was in them, or threw them out intentionally knowing what was in them.

164.     Defendant SCHILLINGER had no legal right to search through Plaintiff's personal property without him present, much less throw any of it in the trash.

165.     Plaintiff left CIM-CHINO the morning of May 16, 2013, returning to San Diego County jail that afternoon and his 90-Day Diagnostic Evaluation was complete.

166.     That each and every act of Defendant COUNTY, by and through their employees, agents, and/or representatives, including but not limited to Defendant SCHILLINGER, as set forth herein is part of a "pattern and practice" of COUNTY, was executed under the color of authority, statutes, ordinances, regulations, laws, customs, training and usages of the COUNTY, by virtue of and under authority of Defendant SCHILLINGER'S employment with COUNTY as a sworn Peace Officer.

167.     That the claims against SCHILLINGER are part of a "pattern and practice" of COUNTY, were performed knowingly, willfully, intentionally, negligently, maliciously and with **"deliberate indifference"** to the rights of Plaintiff.

168.     That Defendants COUNTY and SCHILLINGER have a "pattern and practice" of violating the civil rights of individuals, specifically interfering with access to the courts, and COUNTY and SCHILLINGER are the direct and proximate cause of the claims brought *infra,* against COUNTY and SCHILLINGER.

169.     That Defendant COUNTY operates their sheriff's department and is responsible for and does in fact hire, train, supervise and discipline their Peace

Officers, including SCHILLINGER, in all aspects and performance of said Peace Officers duties.

170.    One of the duties of Defendant COUNTY is to hire Peace Officers of good moral character and fitness.

171.    One of the duties of Defendant COUNTY is to train their Peace Officers with respect to the constitutionally protected rights afforded to all citizens within their jurisdiction, including but not limited to the rights arising under the First, Fourth and Fourteenth Amendments.

172.    One of the duties of Defendant COUNTY is to train their Peace Officers to follow the Constitution and all state and local laws; including ensuring that their employees do not violate constitutionally protected rights of the public.

173.    One of the duties of Defendant COUNTY is to train their Peace Officers to follow the Constitution and all state and local laws, including ensuring that their Peace Officers do not engage in warrantless searches and do not take, damage or destroy private, personal property.

174.    One of the duties of Defendant COUNTY is to train and instruct their Peace Officers to not engage in warrantless searches and to not take, damage or destroy private, personal property.

175.    One of the duties of Defendant COUNTY is to train and instruct their Peace Officers that engaging in warrantless searches and taking, damaging and destroying private, personal property violates constitutionally protected rights of the public.

176.    One of the duties of Defendant COUNTY is to supervise their Peace Officers to ensure constitutionally protected rights, including but not limited to,

rights arising under the First, Fourth, Eighth and Fourteenth Amendments of the United States Constitution are not unlawfully and illegally infringed upon.

177.     One of the duties of Defendant COUNTY is to train and supervise their Peace Officers to follow the Constitution and all state and local laws, including making sure that all their Peace Officers taking, damaging and destroying private, personal property of the public.

178.     One of the duties of Defendant COUNTY is to discipline their Peace Officers for violating the constitutionally protected rights of the public of the public; as well as policy and procedure of COUNTY.

179.     One of the duties of Defendant COUNTY is to discipline their Peace Officers when they violate the constitutionally protected rights of the public.

180.     One of the duties of Defendant COUNTY is to terminate the employment of their Peace Officers when said Peace Officers violates the constitutionally protected rights of the public, including but not limited to the taking, damaging and destroying private, personal property of the public.

181.     That Defendant SCHILLINGER was, at all times relevant hereto, employed as a Peace Officer by Defendant COUNTY, being employed on or around May 16, 2013.

This reference incorporates the above paragraphs into the following cause of actions.

**CAUSE OF ACTION I: 42 USC SECTION 1983 LIABILITY FOR VIOLATION OF CONSTITUTIONAL AND CIVIL RIGHTS- UNLAWFUL SIEZURE UNDER THE FOURTH AMENDMENT; CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AMENDMENT; DENIAL OF DUE PROCESS RIGHTS BY TAKING PERSONAL PROPERTY WITHOUT DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT**

182.     POWERS, QUATMAN, GAMBLE and KRINOCK seized, threw away or "donated" Plaintiff's personal property without Plaintiff's permission, as stated *supra*, without due process of law.

183.     POWERS, QUATMAN, GAMBLE and KRINOCK did so in part by threatening Plaintiff with a potentially deadly weapon[19].

184.     POWERS, QUATMAN, GAMBLE and KRINOCK never gave Plaintiff any option with his personal property. There was only one (1) option; to "donate" it or risk being assaulted with a potentially deadly weapon by KRINOCK.

185.     POWERS, QUATMAN, GAMBLE and KRINOCK were acting under the color and authority of state law, engaged in a "pattern and practice" of conduct, were unreasonable, performed knowingly, willfully, intentionally, maliciously, with gross negligence, callousness, indecency, with reckless disregard and **"deliberate indifference"** to the laws, treaties and Constitution of the United States, and the citizens of the state of California and the United States.

186.     Said violations of constitutionally protected rights by POWERS, QUATMAN, GAMBLE and KRINOCK are part of a routine "pattern and practice" as evidenced by them engaging in the exact same conduct against all incoming inmates at R&R which Plaintiff witnessed.

---

[19] Pepper spray, oleoresin capsicum (OC), is derived from cayenne pepper plants. Although pepper spray is usually referred to by law enforcement personnel as "non-lethal", an April 2003 United States Department of Justice research paper found it to cause multiple deaths. *See* https://www.ncjrs.gov/pdffiles1/nij/195739.pdf

187.     Plaintiff suffered injuries as a proximate cause of POWERS, QUATMAN, GAMBLE and KRINOCK'S actions, including, but not limited to, the following, to wit:

1.   Humiliation;

2.   Emotional Distress;

3.   Psychological Distress;

4.   Losses of the safety, pleasure, joy and vitalities of life that are of a continuing nature;

5.   Loss of irreplaceable personal property, such as Plaintiff's graduation wallet;

6.   Loss of the tremendous amount of time that was required to address POWERS, QUATMAN, GAMBLE and KRINOCK'S illegal and unlawful actions by the filing of this action in federal court.

188.     Plaintiff's constitutionally protected rights to be free of unlawful seizures and to due process of the law by POWERS, QUATMAN, GAMBLE and KRINOCK have violated and caused harm to Plaintiff.

189.     These constitutionally protected rights are clearly established and well known rights.

190.     POWERS, QUATMAN, GAMBLE and KRINOCK are liable under the First, Eighth and Fourteenth Amendments of the United States Constitution, as well as 42 USC §§ 1983, 1988 for violating and interfering with Plaintiff's constitutionally protected rights of being free from unlawful seizures, free from cruel and unusual punishment and denial of due process of law.

191.     The violation of the above listed rights proximately caused Plaintiff

damages for which he is entitled to recover under 42 USC §§ 1983, 1988.

192.     Plaintiff is further entitled to punitive damages to deter POWERS,

QUATMAN, GAMBLE and KRINOCK from engaging in such violations of

constitutionally protected rights in the future.

193.     Any contrary explanation offered by POWERS, QUATMAN, GAMBLE

and KRINOCK for the violation of Plaintiff's constitutionally protected rights are

pretext to shield POWERS, QUATMAN, GAMBLE and KRINOCK from

liability of their wrongful actions.

This reference incorporates the above paragraphs into the following cause of actions.

**CAUSE OF ACTION II: 42 USC SECTION 1983 LIABILITY FOR VIOLATION OF
CONSTITUTIONAL AND CIVIL RIGHTS-DENIAL OF DUE PROCESS RIGHTS BY
FAILING TO RELEASE PERSONAL PROPERTY IN VIOLATION OF THE FOURTH
AND FOURTEENTH AMENDMENTS**

194.     COUNTY failed to transfer Plaintiff's personal property, specifically the

money secured in his trust account, when they transferred Plaintiff to CIM-

CHINO.

195.     COUNTY transferred all of Plaintiff's other personal property to CIM-

CHINO.

196.     Not withstanding the CIM-CHINO violations of Plaintiff's

constitutionally protected rights described in COA I *supra*, Plaintiff had a right to

have all of his personal property, especially Plaintiff's trust account money, to be

transferred contemporaneously to CIM-CHINO.

197.     If Plaintiff's trust account money had been transferred contemporaneously

to CIM-CHINO Plaintiff would have had the ability to spend the $12 it would

have taken to mail his personal property home. Instead Plaintiff's loss of personal property amounted to over $9,000.

198.     COUNTY'S unlawful act of keeping Plaintiff's trust account money is an unlawful seizure of Plaintiff's personal property by COUNTY.

199.     COUNTY'S unlawful act of keeping Plaintiff's trust account money is a violation of Plaintiff's due process rights.

200.     Plaintiff's constitutionally protected rights to be free of unlawful seizures and to due process of law have been violated by COUNTY and caused harm to Plaintiff.

201.     COUNTY'S actions rise to the level of **"deliberate indifference".**

202.     These constitutionally protected rights are clearly established and well known rights.

203.     COUNTY is liable under the Fourth and Fourteenth Amendments of the United States Constitution, as well as 42 USC §§ 1983, 1988 for violating and interfering with Plaintiff's constitutionally protected rights of being free from unlawful seizures and denial of due process of law.

204.     The violation of the above listed rights proximately caused Plaintiff damages for which he is entitled to recover under 42 USC §§ 1983, 1988.

205.     Plaintiff is further entitled to punitive damages to deter COUNTY from engaging in such violations of constitutionally protected rights in the future.

206.     Any contrary explanation offered by COUNTY for the violation of Plaintiff's constitutionally protected rights are pretext to shield COUNTY from liability of their wrongful actions.

This reference incorporates the above paragraphs into the following cause of actions.

**CAUSE OF ACTION III: 42 USC SECTION 1983 LIABILITY FOR VIOLATION OF CONSTITUTIONAL AND CIVIL RIGHTS- DENIAL OF DUE PROCESS RIGHTS BY FAILING TO INTERVENE AND STOP KRINOCK'S ACTIONS IN VIOLATION OF THE FOURTEENTH AMENDMENT**

207.     KRINOCK illegally and unlawfully threatened Plaintiff with unlawful use of force with a deadly weapon.

208.     KRINOCK did in fact threaten Plaintiff with unlawful use of force with a deadly weapon, pepper spray, because Plaintiff refused to sign the PCR-A FORM.

209.     KRINOCK'S actions were witnessed by both POWERS and GAMBLE because they were standing next to KRINOCK.

210.     POWERS and GAMBLE both had a duty to intervene and protect Plaintiff from KRINOCK'S potential homicidal behavior.

211.     POWERS and GAMBLE breached that duty.

212.     Plaintiff suffered severe damages as a result of POWERS and GAMBLE breaching their duty.

213.     POWERS and GAMBLE were the direct and proximate cause of the damages Plaintiff suffered because they refused to intervene and stop KRINOCK.

214.     Plaintiff's constitutionally protected rights to be free of unlawful use of force with a deadly weapon, pepper spray, and the duty of POWERS and GAMBLE to intervene and stop KRINOCK'S potential homicidal behavior have violated Plaintiff's constitutionally protected rights and caused harm to Plaintiff.

215.     POWERS and GAMBLE actions rise to the level of **"deliberate indifference"**.

FIRST AMENDED COMPLAINT - 36

Paul Hupp
Case No.: EDCV-14-00576 xxx (SP)

216.    These constitutionally protected rights are clearly established and well known rights.

217.    POWERS and GAMBLE are both  liable under the Fourteenth Amendment of the United States Constitution, as well as 42 USC §§ 1983, 1988 for not intervening and protecting Plaintiff's from KRINOCK'S unlawful use of force with a deadly weapon, pepper spray.

218.    The violation of the above listed rights proximately caused Plaintiff damages for which he is entitled to recover under 42 USC §§ 1983, 1988.

219.    Plaintiff is further entitled to punitive damages to deter POWERS and GAMBLE from breaching their duty to protect Plaintiff, and stopping KRINOCK from engaging in such violations of constitutionally protected rights in the future.

220.    Any contrary explanation offered by POWERS and GAMBLE for the breaching their duty and allowing KRINOCK to violate Plaintiff's constitutionally protected rights are pretext to shield POWERS and GAMBLE from liability of their wrongful actions.

This reference incorporates the above paragraphs into the following cause of actions.

**CAUSE OF ACTION IV: 42 USC SECTION 1983 LIABILITY FOR VIOLATION OF CONSTITUTIONAL AND CIVIL RIGHTS- DELIBERATE INDIFFERENCE AND THE DENIAL OF DUE PROCESS RIGHTS BY ABUSING THE 90-DAY DIAGNOSTIC EVALUATION IN VIOLATION OF THE FOURTEENTH AMENDMENT**

221.    JOHNWELL is not qualified to conduct any type of valid or reliable 90-Day Diagnostic Evaluation.

222.    JOHNWELL repeatedly used racist terms to address Plaintiff, rendering any 90-Day Diagnostic Evaluation invalid and unreliable even if she were qualified.

223.     JOHNWELL'S 45 minute interview was not sufficient to render any 90-Day Diagnostic Evaluation valid or reliable.

224.     FLESOCK'S two (2) interviews totaling less than 65 minutes was not sufficient to render any 90-Day Diagnostic Evaluation valid or reliable.

225.     FLESOCK'S claim that every application for a professional license has a requirement that all criminal convictions must be disclosed, including the one (1) Plaintiff filled out in 1986, is factually, legally and verifiably incorrect. Plaintiff's teaching application did not have any such statement. Yet FLESOCK used that claim to recommend and support a prison term for Plaintiff.

226.     RIGSBY accepted the unsupported, invalid and unreliable claims of JOHNWELL and FLESOCK without any independent investigation of his own whatsoever, and supported their recommendation that Plaintiff be given a prison term. RIGSBY is therefore liable to Plaintiff in his reliance on JOHNWELL and FLESOCK'S invalid and unreliable 90-Day Diagnostic Evaluation investigations, tests, measurements or how ever else one qualifies their brief interviews.

227.     Plaintiff suffered severe damages as a result of JOHNWELL, FLESOCK and RIGSBY'S invalid and unreliable 90-Day Diagnostic Evaluation testing.

228.     JOHNWELL, FLESOCK and RIGSBY were the direct and proximate cause of the damages Plaintiff suffered because they were unqualified, racist, ignorant of the law, ignorant of the facts and their specious actions amounted to **"deliberate indifference"**.

229. Plaintiff's constitutionally protected rights to be free of JOHNWELL, FLESOCK and RIGSBY'S unlawful actions violated Plaintiff's constitutionally protected rights and caused harm to Plaintiff.

230. These constitutionally protected rights are clearly established and well known rights.

231. JOHNWELL, FLESOCK and RIGSBY are liable under the Fourteenth Amendment of the United States Constitution, as well as 42 USC §§ 1983, 1988.

232. The violation of the above listed rights proximately caused Plaintiff damages for which he is entitled to recover under 42 USC §§ 1983, 1988.

233. Plaintiff is further entitled to punitive damages to deter JOHNWELL, FLESOCK and RIGSBY from continuing to engage in their unlawful and illegal acts, and to stop JOHNWELL, FLESOCK and RIGSBY from engaging in such violations of constitutionally protected rights in the future.

234. Any contrary explanation offered by JOHNWELL, FLESOCK and RIGSBY for their unlawful and illegal acts that violated Plaintiff's constitutionally protected rights are pretext to shield JOHNWELL and FLESOCK from liability of their wrongful actions.

This reference incorporates the above paragraphs into the following cause of actions.

**CAUSE OF ACTION V: 42 USC SECTION 1983 LIABILITY FOR VIOLATION OF CONSTITUTIONAL AND CIVIL RIGHTS- DENIAL OF ACCESS TO THE COURTS IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS**

235. Defendant CASH violated Plaintiff's constitutionally protected rights, including but not limited to, rights arising under the First and Fourteenth Amendments of the United States Constitution, when she denied him access to the

courts[20] by denial of, including but not limited to, access to a law library while he was in the custody of CIM-CHINO, of which CASH was the top administrator in charge at all relevant times of this claim. As a result of that denial Plaintiff had no opportunity to fully and fairly litigate his pending legal claims in civil court, including but not limited to the following three (3) civil actions;

   i.   Hupp v San Diego County et al, United States District Court, Southern District of California, Case No.: 12-cv-492 GPC (RBB);

   ii.   Hupp v Freedom Communications Inc. et al, Superior Court of California, County of Riverside, Case No.: RIC 1204151;

   iii.   Hupp v Judith I. Beyl, Richard A. Beyl, Superior Court of California, County of Riverside, Case No.: RIC 1216945;

   iv.   Hupp v Freedom Communications Inc. et al, Fourth District Court of Appeal, Division Two, Case No.: D57390;

236.    Plaintiff suffered severe damages, including liability judgments exceeding $80,000 in Hupp v Freedom Communications Inc. et al, as a direct result of CASH'S actions.

237.    CASH'S actions rise to the level of **"deliberate indifference"**.

238.    These constitutionally protected rights are clearly established and well known rights.

239.    CASH is liable under the First and Fourteenth Amendments to the United States Constitution, as well as 42 USC §§ 1983, 1988 for violating and interfering with Plaintiff's constitutionally protected rights of access to the courts and due process of law.

[20] See Penal Code §§ 5054, 5058; Gilmore v. Lynch, 319 F.Supp. 105 (N.D. Cal. 1970); Toussaint v. McCarthy, 801 F.2d 1080 (9th Cir. 1986); Zatko v. Rowland, 835 F.Supp. 1174 (N.D. Cal. 1993); Lewis v. Casey, 518 U.S. 343 (1996).

240.     The violation of the above listed rights proximately caused Plaintiff

damages for which he is entitled to recover under 42 USC §§ 1983, 1988.

241.     Plaintiff is further entitled to punitive damages to deter CASH from

engaging in such violations of constitutionally protected rights in the future.

242.     Any contrary explanation offered by CASH for the violation of Plaintiff's

constitutionally protected rights are pretext to shield CASH from liability of her

wrongful actions.

This reference incorporates the above paragraphs into the following cause of actions.

## CAUSE OF ACTION VI: 42 USC SECTION 1983 LIABILITY FOR VIOLATION OF CONSTITUTIONAL AND CIVIL RIGHTS- VIOLATION OF THE BAN ON CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS

243.     Defendant CASH violated Plaintiff's constitutionally protected rights,

including but not limited to, rights arising under the Eighth and Fourteenth

Amendments, when she confined Plaintiff to a cell with no working light for 23.5-

24 hours per day for 47 days while he was in the custody of CIM-CHINO, of

which CASH was the top administrator in charge at all relevant times of this

claim.

244.     Plaintiff suffered severe damages as a direct result of CASH'S actions.

245.     CASH'S actions rise to the level of **"deliberate indifference"**.

246.     This constitutionally protected right is a clearly established and well

known right.

247.     CASH is liable under the Eighth and Fourteenth Amendments of the

United States Constitution, as well as 42 USC §§ 1983, 1988 for engaging in cruel

and unusual punishment.

248.    The violation of the above listed right proximately caused Plaintiff

damages for which he is entitled to recover under 42 USC §§ 1983, 1988.

249.    Plaintiff is further entitled to punitive damages to deter CASH from

engaging in such violations of constitutionally protected rights in the future.

250.    Any contrary explanation offered by CASH for the violation of Plaintiff's

constitutionally protected rights are pretext to shield CASH from liability of her

wrongful actions.

This reference incorporates the above paragraphs into the following cause of actions.

**CAUSE OF ACTION VII: DECLATORY AND INJUNCTIVE RELIEF**

251.    Plaintiff seeks a declaration from this court that the 90-Day Diagnostic

Evaluation is facially unconstitutional due to it being statutorily vague, ambiguous

and overly broad.

252.    Plaintiff seeks a second declaration from this court that the 90-Day

Diagnostic Evaluation is being applied unconstitutionally in its application,

including using it to **"negatively impact"** the subjects of it by locking them down

23.5 to 24 hours per day in a state prison, which FLESOCK admitted was the real

and true purpose. Such a purpose is not stated in the statute as a reason for its use.

*See* paragraphs 43-46, 151-152.

253.    Plaintiff seeks a third declaration from this court that the 90-Day

Diagnostic Evaluation is being applied unconstitutionally in its application by

using unqualified and untrained employees to do the evaluations, such as

JOHNWELL.

254.     Plaintiff seeks a fourth declaration from this court that the 90-Day
Diagnostic Evaluation is being applied unconstitutionally in its application by
forcing the subject to make incriminating statements about convictions that are
currently under appeal, in violation of constitutionally protected rights under the
Fourth, Fifth and Sixth Amendments.

255.     Plaintiff seeks an injunction from this court enjoining further use of the
90-Day Diagnostic Evaluation for the above stated reasons.

This reference incorporates the above paragraphs into the following cause of actions.

### CAUSE OF ACTION VIII: DECLATORY AND INJUNCTIVE RELIEF

256.     Plaintiff seeks a fifth declaration from this court that CIM-CHINO'S
policy of forcing inmates to sign personal property release forms against their will
is unconstitutional and a violation of the constitutionally protected rights against
unlawful seizure, cruel and unusual punishment and due process.

257.     Plaintiff seeks a sixth declaration from this court that CIM-CHINO'S
policy of not giving inmates the adequate time to have their personal property
picked up or mailed home is unconstitutional and a violation of the
constitutionally protected rights against unlawful seizure, cruel and unusual
punishment and due process.

258.     Plaintiff seeks a second injunction from this court that enjoins CIM-
CHINO'S policy of forcing inmates to sign personal property release forms
against their will in violation of the Fourth, Eighth and Fourteenth Amendments.

This reference incorporates the above paragraphs into the following cause of actions.

Paul Hupp
Case No.: EDCV-14-00576 xxx (SP)

## CAUSE OF ACTION IX: DECLATORY AND INJUNCTIVE RELIEF

259.    Plaintiff seeks a seventh declaration from this court that COUNTY'S

policy of not transferring all personal property, specifically inmate trust account

money, contemporaneously with their release, be it to CIM-CHINO or any other

place, is unconstitutional and a violation of due process rights.

260.    COUNTY'S failure to contemporaneously transfer Plaintiff's trust account

money to CIM-CHINO with Plaintiff's other personal property caused severe

damages to Plaintiff, specifically the loss of personal items that CIM-CHINO

unlawfully seized.

261.    That personal property had a replacement cost exceeding $9,000.

262.    Plaintiff's commemorative wallet is irreplaceable, and even though a

monetary amount has been assigned to it, Plaintiff can never be made whole by

the devastating loss because the irreplaceable wallet was a symbol of one of

Plaintiff's greatest accomplishments in life.

263.    Plaintiff on his 52nd and last day at CIM-CHINO (March 25, 2013 through

May 16, 2013) had still not received his trust account money from COUNTY.

264.    Plaintiff seeks a third injunction from this court that enjoins COUNTY'S

policy of not transferring all personal property, specifically inmate trust account

money, contemporaneously with an inmates release and to ORDER COUNTY to

transfer inmate trust account money contemporaneously with an    inmates release,

be it to CIM-CHINO or any other place.

This reference incorporates the above paragraphs into the following cause of actions.

## CAUSE OF ACTION X: DELIBERATE INDIFFERENCE AND GROSS NEGLIGENCE IN THE HIRING OF PEACE OFFICERS

265.     Defendant COUNTY had the power to prevent and stop the wrongs, transgressions and unlawful acts of tortfeasor SCHILLINGER, who is the subject of this complaint, by the proper screening and hiring of Peace Officers.

266.     Plaintiff had a Constitutional right to be free from unlawful seizure of personal property under the Fourth Amendment, which was violated when SCHILLINGER seized Plaintiff's personal property at CIM-CHINO in the R&R.

267.     Plaintiff was deprived of this Constitutional right when COUNTY, through their policy of hiring unlawful and unethical Peace Officers, hired SCHILLINGER, who had a background of dishonesty and a "pattern and practice" of incompetence.

268.     This unethical hiring policy of COUNTY is part of a "pattern and practice" of unethical hiring, was a direct and proximate cause of Plaintiff's injuries, amounted to **deliberate indifference** and directly related to the issues in this complaint.

269.     This unlawful and unethical hiring policy of COUNTY was the moving force behind the Constitutional violations SCHILLINGER perpetrated upon Plaintiff.

270.     Defendant COUNTY had a duty to hire for the position of Peace Officer only those individuals that are of the highest moral and ethical character.

271.     Defendant COUNTY breached that duty in a grossly negligent manner by hiring SCHILLINGER, an unlawful and unethical individual who lacks the moral

character and fitness to be a Peace Officer as evidenced by his civil rights violations outlined in this complaint.

272.     Said unlawful actions by SCHILLINGER as well as the unethical hiring practices of COUNTY were under the color and authority of state law and were part of a "pattern and practice" of conduct, were unreasonable, performed knowingly, willfully, intentionally, deliberately, indifferently, maliciously, with gross negligence, callousness, indecency, with reckless disregard and **"deliberate indifference"** to the laws, treaties and Constitution of the United States, and the citizens of the state of California and the United States.

273.     Defendant COUNTY caused proximate damages to Plaintiff by hiring SCHILLINGER, which enabled SCHILLINGER to engage in the unlawful conduct that is the subject of this complaint, specifically violations of the Fourth Amendment to the United States Constitution, as well as 42 USC §§ 1983, 1988.

274.     Plaintiff suffered severe damages as a result of this gross negligence by Defendant COUNTY.

275.     Defendant COUNTY is liable for any and all other hiring violations/negligence/failures that may be discovered through the course of discovery.

276.     Any contrary explanation offered by COUNTY for the violation of Plaintiff's constitutionally protected rights are pretext to shield COUNTY from liability of their wrongful actions.

This reference incorporates the above paragraphs into the following cause of actions.

## CAUSE OF ACTION XI: DELIBERATE INDIFFERENCE AND GROSS NEGLIGENCE IN THE TRAINING OF PEACE OFFICERS

277.    Defendant COUNTY had the power to prevent and stop the wrongs, transgressions and unlawful acts of tortfeasor SCHILLINGER, which is the subject of this complaint, by the proper training of Peace Officers. Such training includes banning their Peace Officers from engaging in unlawful and illegal seizures.

278.    Defendant COUNTY had a duty to train their Peace Officers in a manner that would not allow their officers, including SCHILLINGER and others, from engaging in unlawful and illegal seizures of citizens, thereby violating the laws, treaties and Constitution of the United States.

279.    Defendant COUNTY breached that duty in a grossly negligent manner by a lack of qualified training, as well as deficient and improper training, thereby allowing SCHILLINGER and others to infringe upon the rights of Plaintiff and other citizens by violating the laws, treaties and Constitution of the United States, specifically violations of the Fourth Amendment to the United States Constitution, as well as 42 USC § 1983. Said unlawful actions by SCHILLINGER were under the color and authority of state law and were part of a "pattern and practice" of conduct, were unreasonable, performed knowingly, willfully, intentionally, deliberately, indifferently, maliciously, with gross negligence, callousness, indecency, with reckless disregard and **"deliberate indifference"** to the laws, treaties and Constitution of the United States, and the citizens of the state of California and the United States.

Paul Hupp
Case No.: EDCV-14-00576 xxx (SP)

280.     Defendant COUNTY caused proximate damages to Plaintiff by training SCHILLINGER in a deficient manner, which enabled SCHILLINGER to engage in the unlawful conduct that is the subject of this complaint, specifically violations of the Fourth Amendment to the United States Constitution, as well as 42 USC §§ 1983, 1988.

281.     Plaintiff suffered severe damages as a result of this gross negligence by Defendant COUNTY.

282.     Defendant COUNTY is liable for any and all other training violations/negligence/failures that may be discovered through the course of discovery.

283.     Any contrary explanation offered by COUNTY for the violation of Plaintiff's constitutionally protected rights are pretext to shield COUNTY from liability of their wrongful actions.

This reference incorporates the above paragraphs into the following cause of action.

## CAUSE OF ACTION XII: DELIBERATE INDIFFERENCE AND GROSS NEGLIGENCE IN THE SUPERVISION OF PEACE OFFICERS

284.     Defendant COUNTY had the power to prevent and stop the wrongs, transgressions and unlawful acts of tortfeasor SCHILLINGER, which is the subject of this complaint, by the proper supervision of its Peace Officers, including SCHILLINGER.

285.     Defendant COUNTY had a duty to supervise their Peace Officers, including SCHILLINGER, so that they follow, obey, observe, understand, comply with, conform with and honor the laws, treaties and Constitution of the United States.

286.     Defendant COUNTY breached that duty in a grossly negligent manner by

failing to supervise SCHILLINGER in a manner that required SCHILLINGER to

follow, obey, observe, understand, comply with, conform with and honor the

laws, treaties and Constitution of the United States, allowing SCHILLINGER to

unlawfully seize personal property of Plaintiff. Said unlawful actions by

SCHILLINGER were under the color and authority of state law and were part of

a "pattern and practice" of conduct, were unreasonable, performed knowingly,

willfully, intentionally, deliberately, indifferently, maliciously, with gross

negligence, callousness, indecency, with reckless disregard and **"deliberate

indifference"** to the laws, treaties and Constitution of the United States, and the

citizens of the state of California and the United States.

287.     Defendant COUNTY caused proximate damages to Plaintiff by failing to

properly supervise SCHILLINGER, said supervision was deficient, which

enabled SCHILLINGER to engage in the unlawful conduct that is the subject of

this complaint, specifically violations of the Fourth Amendment to the United

States Constitution, as well as 42 USC §§ 1983, 1988.

288.     Plaintiff suffered severe damages as a result of this gross negligence by

the Defendant COUNTY.

289.     Defendant COUNTY is liable for any and all other supervision

violations/negligence/failures that may be discovered through the course of

discovery.

290. Any contrary explanation offered by COUNTY for the violation of Plaintiff's constitutionally protected rights are pretext to shield COUNTY from liability of their wrongful actions.

This reference incorporates the above paragraphs into the following cause of action

## CAUSE OF ACTION XIII: DELIBERATE INDIFFERENCE AND GROSS NEGLIGENCE IN THE DISCIPLINING OF PEACE OFFICERS

291. Defendant COUNTY had the power to prevent and stop the wrongs, transgressions and unlawful acts of tortfeasor SCHILLINGER, which is the subject of this complaint, by the proper disciplining of its Peace Officers, including SCHILLINGER.

292. Defendant COUNTY had a duty to discipline their Peace Officers, including SCHILLINGER, so that they follow, obey, observe, understand, comply with, conform with and honor the laws, treaties and Constitution of the United States.

293. Defendant COUNTY breached that duty in a grossly negligent manner by failing to discipline SCHILLINGER in a manner that required SCHILLINGER to follow, obey, observe, understand, comply with, conform with and honor the laws, treaties and Constitution of the United States, allowing SCHILLINGER to unlawfully seize personal property of Plaintiff. Said unlawful actions by SCHILLINGER were under the color and authority of state law and were part of a "pattern and practice" of conduct, were under the color and authority of state law, were unreasonable, performed knowingly, willfully, intentionally, deliberately, indifferently, maliciously, with gross negligence, callousness, indecency, with reckless disregard and **"deliberate indifference"** to the laws,

treaties and Constitution of the United States, and the citizens of the state of

California and the United States.

294.     Defendant COUNTY caused proximate damages to Plaintiff by failing to

properly discipline SCHILLINGER, said supervision was deficient, which

enabled SCHILLINGER to engage in the unlawful conduct that is the subject of

this complaint, specifically violations of the Fourth Amendment to the United

States Constitution, as well as 42 USC §§ 1983, 1988.

295.     Plaintiff suffered severe damages as a result of this gross negligence by

the Defendant COUNTY.

296.     Defendant COUNTY is liable for any and all other discipline

violations/negligence/failures that may be discovered through the course of

discovery.

297.     Any contrary explanation offered by COUNTY for the violation of

Plaintiff's constitutionally protected rights are pretext to shield COUNTY from

liability of their wrongful actions.

This reference incorporates the above paragraphs into the following cause of action.

## CAUSE OF ACTION XIV: DELIBERATE INDIFFERENCE AND GROSS NEGLIGENCE IN THE RETENTION OF PEACE OFFICERS

298.     Defendant COUNTY had the power to prevent and stop the wrongs,

transgressions and unlawful acts of SCHILLINGER if they had not negligently

retained such individuals.

299.     Defendant COUNTY had a duty to only retain honest and trustworthy

employees who would not violate the laws, treaties and Constitution of the

Paul Hupp
Case No.: EDCV-14-00576 xxx (SP)

United States. SCHILLINGER violated numerous laws and constitutionally protected rights.

300.    Defendant COUNTY breached that duty in a grossly negligent manner by failing to supervise SCHILLINGER in a manner that required tortfeasor SCHILLINGER to follow, obey, observe, understand, comply, conform with and honor the laws, treaties and Constitution of the United States, allowing SCHILLINGER to unlawfully seize personal property of Plaintiff. Said unlawful actions by Defendant SCHILLINGER were under the color and authority of state law, were unreasonable, performed knowingly, willfully, intentionally, deliberately, indifferently, maliciously, with gross negligence, callousness, indecency, with reckless disregard and **"deliberate indifference"** to the laws, treaties and Constitution of the United States, and the citizens of the state of California and the United States.

301.    Defendant COUNTY caused proximate damages to Plaintiff by retaining (and failing to properly discipline) SCHILLINGER. Said retention was deficient, which enabled tortfeasor SCHILLINGER to engage in the unlawful conduct that is the subject of this complaint, specifically violations of the Fourth Amendment to the United States Constitution, as well as 42 USC §§ 1983, 1988.

302.    Plaintiff suffered severe damages as a result of this gross negligence by the Defendant COUNTY.

303.    Defendant COUNTY is liable for any and all other supervision violations/negligence/failures that may be discovered through the course of discovery.

304.    Any contrary explanation offered by COUNTY for the violation of

Plaintiff's constitutionally protected rights are pretext to shield COUNTY from

liability of their wrongful actions.

This reference incorporates the above paragraphs into the following counts.

### CAUSE OF ACTION XV: STATE LAW CLAIM FOR CONVERSION

305.    Plaintiff arrived at CIM-CHINO on March 25, 2013, with his personal

property, as stated *supra*, which included his wallet and the contents of his wallet.

306.    POWERS, QUATMAN, GAMBLE, KRINOCK and ROES knowingly,

willfully and intentionally took possession of Plaintiff's wallet and its contents,

depriving Plaintiff of his lawful right to his personal property. Plaintiff personally

saw POWERS with his wallet.

307.    Plaintiff did not consent to POWERS, QUATMAN, GAMBLE,

KRINOCK and ROES knowingly, willfully and intentionally taking possession

of Plaintiff's wallet and its contents, depriving Plaintiff of his lawful right to his

personal property.

308.    Nor would Plaintiff "donate", throw away, abandon, giveaway or engage

in any other action that would deny him his personal property; an irreplaceable

wallet, gift cards with substantial balances on them, a current and valid driver's

license, credit cards and numerous other personal property items that were within

his wallet.

309.    Plaintiff was severely harmed by the actions of POWERS, QUATMAN,

GAMBLE, KRINOCK and ROES as a result of their actions in taking Plaintiff's

wallet.

310.     POWERS, QUATMAN, GAMBLE, KRINOCK and ROES actions in

taking his wallet and its contents were the direct and proximate cause of

Plaintiff's loss and harm.

311.     Any contrary explanation offered by POWERS, QUATMAN, GAMBLE,

KRINOCK and ROES for engaging in their illegal conduct and unlawful actions

in the taking of Plaintiff's personal property is pretext to shield POWERS,

QUATMAN, GAMBLE, KRINOCK and ROES from liability of their wrongful

actions.

This reference incorporates the above paragraphs into the following counts.

## CAUSE OF ACTION XVI: STATE LAW CLAIM FOR CIVIL ASSAULT

312.     KRINOCK threatened Plaintiff with unlawful use of force and with a

deadly weapon, pepper spray, simply because Plaintiff was exercising his

constitutionally protected right of due process of law.

313.     Plaintiff reasonably believed he was going to be assaulted by KRINOCK

with unlawful use of force with a deadly weapon, pepper spray. The actions of

ALL defendants in this action, while in the course of their government

employment, acting under color and authority of state law, engaged in numerous

civil wrongs as outlined in this complaint.

314.     KRINOCK did in fact threaten Plaintiff with unlawful use of force with a

deadly weapon, pepper spray, if he refused to sign the PCR-A FORM.

315.     Plaintiff did in fact sign the PCR-A FORM under KRINOCK'S threat of

unlawful use of force with a deadly weapon, pepper spray, because there was no

doubt in Plaintiff's mind KRINOCK would follow through on his threat.

Paul Hupp
Case No.: EDCV-14-00576 xxx (SP)

316.     Plaintiff in no way consented to KRINOCK'S unlawful use of force with a

deadly weapon, pepper spray.

317.     Plaintiff was severely harmed by KRINOCK'S unlawful use of force with

a deadly weapon, pepper spray.

318.     KRINOCK'S unlawful use of force with a deadly weapon, pepper spray,

was the direct and proximate cause of Plaintiff's harm.

319.     Any contrary explanation offered by KRINOCK for engaging in his illegal

conduct and unlawful action in assaulting Plaintiff with a deadly weapon is

pretext to shield KRINOCK from liability of his wrongful actions.

This reference incorporates the above paragraphs into the following count.

## CAUSE OF ACTION XVII: STATE LAW CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

320.     The actions of ALL defendants in this action, while in the course of their

government employment, acting under color and authority of state law, engaged

in numerous civil wrongs as outlined in this complaint.

321.     The actions of ALL defendants resulted in numerous civil wrongs against

Plaintiff as outlined in this complaint.

322.     As a direct and proximate cause of these actions by ALL defendants,

Plaintiff suffered extreme emotional and psychological distress as outlined in this

action.

323.     These acts by ALL defendants were beyond the bounds of human

decency.

324.     The failure of ALL defendants to take any actions to stop such outrageous

and unlawful behavior- including KRINOCK'S threat of using a potentially

deadly weapon- constitutes extreme, outrageous and intentional acts of ALL defendants

325.     COUNTY is liable for the injuries proximately caused by their act or omission of their employee, SCHILLINGER, who was acting within the scope of his Peace Officer duties for COUNTY when he unlawfully seized Plaintiff's personal property. *See* <u>Blankenhorn v. City of Orange</u>, 485 F.3d 463, 488 (9th Cir. 2007) finding that Cal. Gov't Code § 815.2(a) "clearly allows for vicarious liability" against a city; <u>Robinson v. Solano Cnty.</u>, 278 F.3d 1007, 1016 (9th Cir. 2002) *citing* Cal. Gov't Code § 815.2 and holding that, as to state law tort claims respondeat superior liability applies and a public entity employer is immune only insofar as the public employee is immune. SCHILLINGER is not immune.

326.     ALL defendants did these unlawful acts knowingly, willfully and purposefully with intent to cause Plaintiff severe emotional distress and mental anguish. Said unlawful actions by ALL defendants were under the color and authority of state law and were unreasonable, performed knowingly, willfully, intentionally, deliberately, indifferently, maliciously and with gross negligence, callousness, indecency and with reckless disregard and deliberate indifference to the laws, treaties and Constitution of the United States, and the citizens of the state of California and the United States.

327.     Such actions caused embarrassment, humiliation, shame, fright, fear, and grief in Plaintiff, and said actions were much more than a reasonable person could endure.

Paul Hupp
Case No.: EDCV-14-00576 xxx (SP)

328.    Defendant COUNTY is also liable for the actions of SCHILLINGER for their negligent failure to adequately screen in the hiring, training, supervision, discipline and retention of SCHILLINGER establishing **"deliberate indifference"** and creating intentional infliction of emotional distress.

329.    COUNTY and SCHILLINGER'S liability is created by state statute;

Gov. Code § 815.2 (a) **A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment** if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative. Emphasis added. (This would include liability of COUNTY and SCHILLINGER for failure to investigate and then bringing criminal charges without "probable cause").

Gov. Code § 815.6(a) Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, **the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.** Emphasis added. (This would include bringing criminal charges without "probable cause").

Gov. Code § 820(a) Except as otherwise provided by statute (including Section 820.2), **a public employee is liable for injury caused by his act or omission to the same extent as a private person.** Emphasis added. (This would include bringing criminal charges without "probable cause").

330.    Any contrary explanation offered by ALL defendants for their conduct under this cause of action is pretext to shield ALL defendants from liability of their wrongful actions.

## PRAYER FOR RELIEF

ON THESE ABOVE LISTED GROUNDS, Plaintiff Paul Hupp prays that this Honorable United States District Court grants judgment in his favor and against all DEFENDANTS; COUNTY, CASH, RIGSBY, FLESOCK, JOHNWELL, POWERS, QUATMAN, GAMBLE, KRINOCK, SCHILLINGER and ROES as follows;

1.  For compensatory, special and general damages according to proof, but exceeding $1,000,000;

2.  For punitive and exemplary damages according to proof;

3.  For prejudgment and post judgment interest;

4.  All fees, costs and expenses for the bringing of this claim, including but not limited to, all attorney fees and costs provided for under 42 U.S.C. Section 1988.

5.  For a declaration that Penal Code §1203.03 is unconstitutional in its application as it is vague, ambiguous and overly broad.

6.  For a second declaration that Penal Code §1203.03 is unconstitutional as applied.

7.  For a third declaration that Penal Code §1203.03 being applied unconstitutionally in its application by using unqualified and untrained employees.

8.  For a fourth declaration that Penal Code §1203.03 is being applied unconstitutionally in its application by forcing the subject to make incriminating statements about convictions that are currently under appeal.

9.  For an injunction enjoining the future use of Penal Code §1203.03.

10. For a fifth declaration that CIM-CHINO'S policy of forcing inmates to sign personal property release forms against their will is unconstitutional and a violation of constitutionally protected rights.

11. For a sixth declaration from this court that CIM-CHINO'S policy of not giving inmates the adequate time to have their personal property picked up or

mailed home is unconstitutional and a violation of constitutionally protected rights

12. For a second injunction from this court that enjoins CIM-CHINO'S policy of forcing inmates to sign personal property release forms against their will.

13. For a third injunction from this court ordering CIM-CHINO to give inmates an adequate amount of time to have personal property mailed home or picked up.

14. For a seventh declaration that COUNTY'S policy of not transferring all inmates' personal property contemporaneously with their release (including but not limited to CIM-CHINO or anywhere else) including inmate trust account money, is unconstitutional.

15. For a fourth injunction ordering COUNTY to transfer all inmates' personal property contemporaneously with their release (including but not limited CIM-CHINO or anywhere else), including inmate trust account money.

16. All other appropriate legal and equitable relief this Court deems justified in granting.

## **RIGHT TO AMEND**

Plaintiff hereby expressly reserves the right to amend this action to include any actions arising from discovery and to add in Roe defendants.

1

2
## JURY DEMAND

3
Plaintiff requests trial by jury on all genuine and disputed issues of material fact in this

4
case.

5
Respectfully submitted.

6
Dated this 27th day of March, 2014

7
/s/ Paul Hupp

Paul Hupp

8
965 Hidden Oaks Drive

Beaumont, CA 92223

9
*In Propria Persona*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

"Exhibit #1"

<u>Hupp v. County of San Diego et al</u>

United States District Court
Central District of California

Case No.: EDCV-14-00576 xxx (SP)

DEPARTMENT OF CORRECTIONS

STATE OF CALIFORNIA

DISTRIBUTION
ORIG: Inmate (White)
CC: Property File (Canary)
Trust Office (Pink)
Central File (Green)

## PROPERTY AND CASH RECEIPTS – ARRIVAL

| INMATE'S NAME | NUMBER | CASH PLACED IN INMATE'S ACCOUNT |
|---|---|---|
| HUPP, PAUL H. | N/C AN8164Z | |

DISPOSITION CODE:     K=KEPT IN POSSESSION (WATCHES, RINGS, AND METALS VALUED LESS THAN $30)
M=MAIL     D=DONATED     S=HELD IN SAFE     V=VAULT

| QUANTITY | ARTICLES | DISP. | QUANTITY | ARTICLES | DISP. | QUANTITY | ARTICLES | DISP. |
|---|---|---|---|---|---|---|---|---|
| | BELT | | | SUIT | | | DENTURES | |
| | BLOUSE | | | SWEATER | | | DRIVER'S LICENSE | |
| | CAP | | | TANK TOP | | | EYEGLASSES | |
| | COAT | | | UNDERWEAR | | | KEYS | FIK | K |
| | DRESS | | | | | | | |
| | HANDKERCHIEF | | | | | | | |
| | HAT | | | LEGAL PAPERS | K | | MEDICAL ID | |
| | JACKET | | | LETTERS | | | MISC. ID | |
| | NECKTIE/SCARF | | | PHOTOS | | | MARR. CERT. | |
| | OVERCOAT | | | PURSE | | | BIRTH CERT. | |
| | PAJAMAS | | | BILLFOLD | | | SEL. SER. CARD | |
| | PANTS/SLACKS | | | BOOKS | | | SOC. SEC. CARD | |
| | SHIRT | | | BIBLE | | | RELIGIOUS MEDALS | |
| | SHOES | | | DICTIONARY | | | RING | |
| | SHORTS | | | | | | SUNGLASSES | |
| | SKIRT | | | | | | WATCH | |
| | SLIPPERS | | | COIN | | | | |
| | SOCKS | | | CURRENCY | | | | |
| | STOCKINGS | | | CANTEEN DUCAT | | | | |

DESCRIPTION OF ITEMS ALLEGED BY INMATE TO HAVE A VALUE OVER $30

*no personal property*

DESCRIPTION OF ITEMS "TO BE DESTROYED"

ARTICLES LISTED AS "MAIL" ABOVE ARE TO BE FORWARDED TO:
NAME

ADDRESS

CITY

STATE AND ZIP CODE

## CLAIM AND RELEASE

I relinquish all claim to the articles listed above as "Donated", and hereby acknowledge receipt of articles listed as "Kept in Possession". The above is a correct inventory of personal property in my possession at the time of admission.

| SIGNATURE OF INMATE | DATE 3/25/13 | WITNESSING OFFICER |
|---|---|---|

I hereby authorize destruction of articles listed above as "To be Destroyed".

| SIGNATURE OF INMATE | DATE | WITNESSING OFFICER |
|---|---|---|

I hereby acknowledge receipt of the articles listed above as "Held in Safe" which was given to me upon my release from the institution.

| SIGNATURE OF INMATE | DATE | WITNESSING OFFICER |
|---|---|---|

CDC - 104 (REV. 4/77)     OSP 06 98076

"Exhibit #2"

## Hupp v. County of San Diego et al

United States District Court
Central District of California

Case No.: EDCV-14-00576 xxx (SP)

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION

EDMUND G. BROWN JR., GOVERNOR

**DIVISION OF ADULT INSTITUTIONS**
California Institution for Men (CIM)
P. O. Box 128
Chino, CA 91710



June 13, 2013

Mr. and Mrs. Hupp
965 Hidden Oaks Dr.
Beaumont, CA 92223

Mr. and Mrs. Hupp,

This is in response to your letters dated April 16, 2013, and May 27, 2013, which were forwarded to my office for review and response. In your letters, you have concerns with letters, cards, the phone system, a cashier's check, postage paid envelopes, photos, and other personal items belonging to your son, Inmate Paul Hupp, #AN-8164Z, while housed at the California Institution for Men (CIM).

On March 25, 2013, Mr. Hupp was transferred from the San Diego County Sheriff's Department to CIM as a New Felony Commitment. Mr. Hupp was received into our Receiving and Release (R&R) with minimal property as indicated on the CIM R&R Sergeant's Work Sheet form "Property and Cash Receipts-Arrival" (Copy enclosed) which also shows he arrived without any funds available. R&R Officers conducted intake processing as normal, which incorporates collection of any inmate funds for inclusion in their respective Inmate Trust Account and personal property disposition.

The personal property you claim was in your son's possession, i.e., Wallet containing a driver's license, Discover credit card, Nordstrom $50.00 gift card, Amazon.com $50.00 gift card, Kohl's $50.00 gift card, other miscellaneous items, and personal clothing the following was noted:

The "Property and Cash Receipts-Arrival" form shows the personal clothing was donated as indicated by the "D" in the Disposition column. This is due to not having any funds available to pay for the cost associated with mailing his personal clothing home. The form also indicates his signature at the bottom of the form giving his consent to donate his personal clothing. The personal clothing you claim Mr. Hupp had in his possession are non-allowable items at CIM and must either be mailed home at his expense, or donated.

The wallet you claim Mr. Hupp had in his possession is not indicated on the "Property and Cash Receipts-Arrival" form, this form signed by Mr. Hupp states "The above is a correct inventory of personal property in my possession at the time of admission".

Mr. and Mrs. Hupp
Re: Paul Hupp AN-8164Z
Page 2

This form only indicates (10) Legal papers, (10) Letters, and (1) Fish Kit, Kept in his possession and (1) Pant/Slacks, (1) Shirt, and (1) Shoes, Donated.

Our Inmate Accounting Office was contacted regarding the $50.00 cashier's check in question, and our records show it was received by the CIM Inmate Accounting Office but the funds have now been forwarded to the Inmate Account Branch Office in Sacramento, CA. Your son must write this office to have his funds returned to him. The address is: Inmate Account Branch, P.O. Box 276088, Sacramento, CA. 95827.

The Mailroom was questioned regarding your son's mail while housed at CIM, specifically, postage paid envelopes and photos.  If your son paroled prior to receiving his mail, the mail will be returned to the original sender via the U.S. Postal Service.  It is not our policy to withhold any mail from inmates; once the mail is received into the Institution it is processed and delivered to the inmate in the most expedient manner. Unfortunately, due to temporary staffing shortages in the Mailroom, the mail can be delayed some time and will be processed as soon as possible. The Mailroom has rectified past mail delivery delays by hiring additional staff to assist.

Lastly, regarding your issue with the telephone system, CIM recently relocated the operator telephone system and trained staff on the use of telephone system to better enhance the operation.  Keep in mind there are numerous employees at this Institution and only a limited number of lines allotted for our phone system.  If you are unable to make a connection the first time, please call again to try a new connection. This should resolve any phone issues you may incur.

I hope this information was helpful. If you have further questions regarding your sons property, please direct your inquires to CIM R&R Sergeant J. Powers at (909) 597-1821 extension 6187. Any mail related issues, please contact Mail Room Supervisor OSSI A. Vicario at 909-597-1821 extension 4316.

D. R. KING
Associate Warden
Central Services
California Institution for Men